## Gettysburg Historic Holdings Inc.
## v. Adams County

96

*Dean S. Piermattei,* for plaintiffs.
*John M. Hartvell* and *Michael D. Reed,* for defendants.

GEORGE, *J.,* January 11, 2007—In early 1996, defendant Adams County owned a 287-acre tract of land located within the southeast quadrant of the intersection of U.S. Route 30 and U.S. Route 15 in Straban Township, Adams County, Pennsylvania. The county determined that the property would be developed into a business, commercial, and light industrial center to be known as the Adams County Commerce Center. To this end, by agreement dated February 14, 1996, the county, in exchange for consideration of $24,000, granted North Ridge Associates (NRA) an exclusive option to purchase all or a portion of an approximately 90-acre parcel of the commerce center (option parcel) at a set price designated in the agreement. The agreement was quite comprehensive and called for NRA to develop the option parcel for uses consistent with Civil War history and the Adams County tourist industry. Although the option agreement did not specifically discuss road access to the property, the proposed sales agreement attached to the option agreement provided that access to the option parcel would either be by direct access from U.S. Route 30 to service the option parcel only or by a private connector street from a main access road providing access from U.S. Route 30 to the remainder of the county's land adjoining the option parcel. Determination of the manner of access was to be controlled by a traffic study prepared by a mutually acceptable traffic engineer. The sales agreement further provided for a shared cost allocation in the event access occurred by a connector road from the main access road. Attached as an exhibit to the option agreement was a survey of the entire county parcel which contemplated a main access to the entire commerce center from U.S. Route 30 to be developed in an area located on the re-

maining county property adjoining the option parcel. For purposes of clarity, this main access route as depicted on the original survey shall hereinafter be referred to as the "boulevard."

During the time period between February 14, 1996 and February 1, 1999, the Adams County Commissioners turned for assistance in developing the commerce park to the Adams County Economic Development Corporation (ACEDC).[1] ACEDC assumed the lead role in acquiring sewer and water service to the commerce center. In addition, ACEDC was charged with the development of the remainder of the commerce center property. When it became apparent that NRA was not prepared for development of the option parcel, the county and ACEDC looked at other alternatives to launching development on the remaining county property. In furtherance of this goal, on June 16, 2000, ACEDC, the county, Straban Township, and the Commonwealth of Pennsylvania Department of Transportation entered into a highway occupancy permit construction and security agreement (HOP). The purpose of the agreement was to secure access to the remaining portion of the commerce center not subject to the option agreement, which consisted of the approximately 201.86 remaining acres (ACEDC project). The HOP was entered after the county and ACEDC opted to access the ACEDC project from State Route 30 across existing Cavalry Field Road to a main road bisecting the project to be designated as V-Twin Drive.

---

1. ACEDC is a private, not-for-profit corporation incorporated in 1989 for purposes of providing county-wide economic development services. ACEDC is funded, in part, by Adams County. At all times relevant to this litigation, the three Adams County Commissioners, in their official capacity, were members of the board of directors.

The HOP envisioned a two-phase build-out. Phase I consisted of improvements to old Cavalry Field Road and its intersection with State Route 30, while Phase II required construction of an additional eastbound lane on State Route 30 and an additional southbound off-ramp left-turn lane from State Route 15 onto State Route 30. The HOP further provided, in relevant part, that the township would not issue further building permits for construction within the commerce center once the average daily traffic on V-Twin Drive reached 4,135 vehicles per day, unless and until advised in writing by PennDOT that a supplemental highway occupancy permit for full build-out of the proposed project would be issued or, on the other hand, was not required.

On February 1, 1999, NRA attempted to exercise its option to purchase the entire option parcel by placing an additional $24,000 in escrow, as contemplated by the option agreement. However, partially due to the length of time between execution of the original option agreement and NRA's exercise of their rights under that agreement,[2] the county refused to sign the agreement of sale. Faced with this stalemate, the parties undertook extensive negotiations in an effort to resolve their various disagreements.

As ACEDC moved forward with the development of the ACEDC project, negotiations between NRA and the county digressed. On October 16, 2000, at the direction of the county commissioners, County Solicitor John M. Hartzell forwarded a letter to NRA's counsel notifying them that the county believed the option agreement to

2. There is no indication of any breach of contract by NRA in delaying the exercise of their rights under the option agreement.

be null and void based upon the failure of NRA to timely perform. This notification prompted further negotiations which culminated in an addendum to option agreement and agreement of sale executed between the parties on April 18, 2001. The addendum represented that it resolved "various and sundry unforeseen circumstances" which had arisen between the execution of the option agreement and execution of the current addendum. The document dictated that it "shall prevail in all respects, for all purposes, and under any and all circumstances, in the event of any inconsistency or conflict with the terms and conditions of the option agreement and/or agreement of sale." The parties agreed the addendum would "fully and finally agree upon and resolve any and all issues regarding any and all matters" mentioned in the addendum.

Of importance to the present matter are two provisions contained in the addendum agreement. The first, paragraph 2(d)(vi), modified paragraph 6(e) of the option agreement in respect to the parties' obligations for the costs of constructing access to the option parcel.[3] In ad-

---

3. Since this language is at the heart of the disagreement between the parties, it is set forth specifically as follows:

"It is contemplated by the parties that the access to the option parcel shall be only by a spur or connection street from the main entrance drive (the boulevard) as set forth in the 'Background' section of the [NRA]—Adams County Economic Development Corporation agreement, dated September 1, 2000. [NRA] shall be obligated to pay or otherwise provide funding for one-half of the cost of constructing such main access road (the boulevard) from the U.S. Route 30 right of way to the south side of the aforementioned spur or connector street, as well as the full cost of said spur or connector street from said main access road. [County] shall be responsible for any improvements to U.S. Route 30 and/or U.S. Route 15, including but not limited to cartway widening, acceleration deceleration and turning lanes, and traffic signals,

dition, paragraph 2(b)(xii) expressly ratified the June 16, 2000 HOP.

On August 23, 2001, NRA assigned all of its right, title, and interest in the option and addendum, as well its equitable interest in the option parcel, to Gettysburg Historic Holdings Inc. (HH).[4] By deed dated August 23, 2001, the county transferred title to the option parcel to ACEDC. Subsequent deed that same date transferred title of the option parcel from ACEDC to HH.

In the fall of 2003, a representative of HH contacted the commissioners to advise of HH's intent to begin construction of certain commercial projects on the option parcel. HH further asserted that the county would be required to bear the costs of improvements to U.S. Routes 30 and 15, including the boulevard, as required by previous agreements. In November 2003, the commissioners consulted with special counsel, John R. White, Esquire, who, as former county solicitor, had been involved in the commerce park transactions from the inception. By memorandum dated December 18, 2003, Attorney White essentially opined that his review of the documentation

---

which may be required in connection with obtaining highway occupancy permits for the construction of the boulevard (the main access road to the remaining lands of the [county] from U.S. Route 30). In the event that [NRA] desires to pursue the option of having any sort of direct access from U.S. Route 30 to service the option parcel only, the following shall prevail: (i) [NRA] shall be solely liable for any and all such costs and expenses in connection with, or arising from, such direct access, including, but not necessarily limited to, the expense of constructing such direct access, as well the expense of any and all improvements to or modifications of U.S. Route 30 and/or U.S. Route 15 which may be required in connection with such direct access...."

4. For purposes of clarity, both NRA and HH will hereinafter be interchangeably and collectively referred to as "HH."

failed to reveal any indication as to the timing of construction of the boulevard and related U.S. Routes 15 and 30 improvements. His memorandum also recognized an issue concerning the county's obligation to pay for one-half of development of the boulevard, noting that the documents did not specifically obligate the county in this regard. Attorney White noted that resolution of these issues would control the county's obligation to fund the improvements and that, absent the issue of timing, the county was "liable for the controverted improvements to U.S. Routes 15 and 30."

By application dated March 15, 2004, HH and ACEDC filed an application for highway occupancy permit with PennDOT seeking permission to construct the boulevard and related improvements to U.S. Route 30. A permit for the construction was granted by PennDOT. HH, at their cost, subsequently completed the road improvements pursuant to the permit. Despite requests by HH, the county has refused to reimburse HH for the costs of the improvements. This action followed.

In their suit, HH seeks specific performance under the various contracts claiming the county is obligated to reimburse HH for the cost of the improvements of U.S. Routes 30 and 15, as well as one-half of the costs associated with constructing the boulevard. In addition, HH seeks an order directing the county to cooperate with and assist HH in obtaining all governmental permits and approvals necessary for development of the option parcel. They further seek damages under a breach of contract theory related to costs incurred by HH as a result of the county's alleged breach including contractual claims for interest, costs, and attorney fees. In a related claim, HH seeks damages based upon a theory of promissory estop-

pel, essentially alleging that they have been damaged by their justifiable and actual reliance on misrepresentations and misleading warranties made by the county. Finally, they seek damages, including punitive damages, on the theory of fraudulent misrepresentation, claiming that the county intentionally and fraudulently misled HH into developing the roadway infrastructure at a time the county had no intention to honor the alleged representations made to HH. After a lengthy and thorough discovery, each party has moved for summary judgment.[5]

The standards which govern summary judgment are well settled. A court shall enter summary judgment only whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense that could be established by additional discovery. *Fine v. Checcio,* 582 Pa. 253, 265, 870 A.2d 850, 857 (2005). A motion for summary judgment is based on an evidentiary record that entitles the moving party to judgment as a matter of law. *Swords v. Harleysville Insurance Companies,* 883 A.2d 562, 566 (Pa. Super. 2005). In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the non-moving party with all doubts as to the exis-

---

5. The initial complaint was filed in this matter on December 30, 2003. After the pleadings were closed and discovery completed, both parties moved for summary judgment. By order dated August 17, 2006, HH was granted permission to file an amended complaint. All parties were also granted additional time to conduct further discovery. On August 22, 2006, HH's amended complaint was filed. Pleading, once again, has been concluded and the record has been supplemented through additional discovery. On October 26, 2006, a revised motion for summary judgment was filed by HH. Answer to the revised motion for summary judgment has been filed pursuant to the Pennsylvania Rules of Civil Procedure. Both parties have been granted time to file supplemental briefs. This matter is now ripe for disposition.

tence of a genuine issue of material fact being resolved against the moving party. *Id.* at 566-67. Finally, the court may grant summary judgment only when the right to such judgment is clear and free from doubt. *Id.* at 567.

HH's motion for summary judgment cites specific language in the various agreements reached between the parties as support for what it claims is a clear obligation on the part of the county to fund the U.S. Routes 30 and 15 improvements, as well as one-half of the boulevard construction. They argue that the language of the various agreements entered between the parties is unambiguous and, therefore, as a matter of law requires judgment in their favor.

The fundamental rule in interpreting a contract is to ascertain and give effect to the intent of the contracting parties. *Murphy v. Duquesne University of the Holy Ghost,* 565 Pa. 571, 590-91, 777 A.2d 418, 429 (2001). The intent of the parties to a written agreement is embodied in the writing itself. *Steuart v. McChesney,* 498 Pa. 45, 48-49, 444 A.2d 659, 661 (1982). Courts do not assume a contract's language was chosen carelessly, nor do they assume the parties were ignorant of the meaning of the language employed. *Id.* at 51, 444 A.2d at 662. When contractual language is clear and unequivocal, its meaning must be determined by its contents alone. *Murphy,* 565 Pa. at 591, 777 A.2d at 429. A court may not modify the plain meaning of the contract under the guise of interpretation. *Little v. Little,* 441 Pa. Super. 185, 190, 657 A.2d 12, 15 (1995). Finally, when interpreting a contract, words that are clear and unambiguous must be given their plain and ordinary meaning. *Donegal Mutual Insurance Co. v. Baumhammers,* 893 A.2d 797, 810 (Pa. Super. 2006).

After a careful and thorough review of the record, I find that there is no ambiguity as to the county's obligation to fund the improvements which are the subject of this action. The April 18, 2001 addendum unequivocally provides that the county "shall be responsible for any improvements to U.S. Route 30 and/or U.S. Route 15, including but not limited to cartway widening, acceleration deceleration and turning lanes, and traffic signals, which may be required in connection with obtaining highway occupancy permits for the construction of the boulevard." Addendum to option agreement and agreement of sale, April 18, 2001, paragraph 2(d)(vi). Clearly, the plain and ordinary meaning of these words reflects the intent of the parties.

The county does not contest the validity of the contractual relationship between the parties; however, it challenges the meaning and interpretation of the option agreement and addendum. In this regard, the county argues that construing the language of the addendum in the manner suggested by HH is much too narrow and that a fair reading of the obligations of the parties under the document requires a much broader and historical review of the text. They suggest that a complete reading of the addendum, specifically paragraph 2(d)(vi), reveals that the county's obligation to fund the improvements is only triggered when access to the option parcel is not "direct access." In instances of "direct access" to the option parcel, the county points out different language in that same paragraph of the addendum. This language provides that if HH pursues the option of having any sort of direct access from U.S. Route 30 to the option parcel only, HH shall be solely liable for the costs and expenses of the improvements. The county concludes that,

since the record establishes that the boulevard is "direct access" to the option parcel, the county has no legal obligation to fund the improvements. Although imaginative, I fail to find any support for this argument in the record.

In order to place the county's argument in proper context, it is necessary to review the historical background from which this argument finds its genesis. The record reveals that the commerce center project was in its infancy when HH purchased the option rights to the option parcel. Initial plans for the commerce center envisioned a main access to the commerce center off of U.S. Route 30 along the boulevard. There would also be a secondary access to the commerce center from existing Cavalry Field Road, which also junctions with U.S. Route 30. The county suggests that part of the "various and sundry unforeseen circumstances" which resulted in the addendum to the option agreement involved the county's frustration with HH's failing to take a leadership role in development of the infrastructure for the commerce park. Although there is no support for their argument in any of the contractual documents, nor in the minutes of any meetings, the county currently implies that they anticipated development of the option parcel to be the anchor for the commerce park. At this time, it was contemplated that the option parcel would be home to a new visitor center for Gettysburg National Park. Unfortunately, initial development plans for the option parcel as a visitor center were unsuccessful through no fault of any of the parties. The subsequent shift in development plans, and the necessary background work, caused HH to maximize the time period within which they could exercise their option rights under the option agreement

to the great consternation of county officials. Nevertheless, it is undisputed that HH met all time limits in exercising their option rights.

As a result of the passage of time due to HH's change of plans, it became apparent that full development of the remaining portions of the commerce park could not be coordinated with development of the option parcel. County officials turned to ACEDC for acceleration of the commerce park development. In approximately 1999-2000, with ACEDC leading the build-out of the remainder of the commerce park, two corporations, Battlefield Harley Davidson and Pella Windows, were secured to develop lots at the commerce park. In coordination with the Pella project, ACEDC obtained grant funding to develop the roadway infrastructure necessary to access the Pella lot, which was located at the most southern point of the commerce park. ACEDC made the decision that access to the Pella lot would be obtained along the road designated V-Twin Drive which would access Cavalry Field Road and, in turn, provide access to State Route 30. Unfortunately, there is a paucity of information in the record as to the details affecting this decision. Nevertheless, Catherine Cresswell, president of ACEDC at all relevant times, recalls that the decision to develop V-Twin Drive as a primary entrance was due in part to V-Twin Drive's ability to access more developmental lots in the commerce park. According to Cresswell, ACEDC made the policy determination that the industrial lots in the commerce park could be better accessed by V-Twin Drive while the tourism traffic could separately access the commerce park by way of the boulevard. Deposition of Catherine Cresswell, December 15, 2005, 15:17-17:23. In furtherance of the development of

V-Twin Drive, ACEDC, Adams County, Straban Township, and PennDOT executed the previously referenced HOP. The HOP recognized a number of improvements were necessary prior to full build-out of the entire ACEDC project; however, PennDOT was willing to defer construction of "required off-site highway improvements made necessary by the full build-out" of the commerce park conditioned upon ACEDC's agreement to apply for supplemental HOP before daily traffic in the park reached 4,135 vehicles per day.

Several months later, on September 6, 2000, ACEDC and the county recorded an approved subdivision plan for the commerce park.[6] The subdivision plan recognized the existence of V-Twin Drive and designated an area adjacent to the option parcel as "area reserved exclusively for future street." The location of this designation is in the identical location of the boulevard as identified in the survey attached to the 1996 option agreement.

Just prior to recordation of the subdivision plan, on September 1, 2000, HH and ACEDC entered an agreement for bridge construction. Apparently, designation of the wetlands within the commerce park had disclosed that the boulevard traversed an area designated as "wetland" pursuant to federal law. The agreement for bridge construction essentially pledges cooperation between the two entities to obtain grants or other forms of funding for construction of a bridge to traverse the wetland area. ACEDC further agreed that HH would not be required to delay development of the option parcel due to efforts to obtain grant funding and that HH may develop their lot on such a time schedule as they shall determine. Fi-

6. The subdivision plan is recorded in plat book 78, page 92 in the Adams County Recorder of Deeds Office.

nally, to the extent that other sources of funding were unavailable, ACEDC agreed to pay full costs of the construction of the bridge. A reading of the preliminary paragraphs of the bridge agreement reveals that it was prompted by HH's unwillingness to participate in the recordation of the aforementioned subdivision plan absent some resolution of the financial responsibilities related to construction of the boulevard bridge. Interestingly, the agreement for bridge construction includes the following representation:

"The subdivision plan, as approved by Straban Township, with the review of Adams County, both as fee title holder to the Adams Commerce Center, and through the county planning commission, contains a main entrance boulevard, having a width of 100 feet, providing access to Route 30 from Adams Commerce Center. The boulevard shall be used by HH to provide access to and from lot 16."

During approximately this same time period, the "various and sundry unforeseen circumstances" developed which cumulated in the execution of the "addendum to option agreement and agreement of sale." The addendum was apparently an effort by all parties to coordinate the numerous agreements previously entered by the separate parties into a single unified arrangement. Although for purposes of this opinion, the specific motivation of the respective parties in executing the addendum is not critical; it is apparent from the record that execution of the addendum followed both internal concerns by county officials,[7] and notice by non-county entities,

---

7. See June 7, 2000 memorandum from special counsel White to Adams County Commissioners, John R. White, Esquire deposition defendant's exhibit no. 17.

that the uncoordinated development of the commerce park was jeopardizing its success and, potentially, violating the rights of the purchasers of commerce center lots. Following execution of the addendum, title to the option parcel was transferred to HH.

On March 15, 2004, ACEDC joined HH in applying for the highway occupancy permit in order to obtain authorization from PennDOT for construction of the boulevard. The boulevard was subsequently constructed at the cost of HH. It is located at the area designated by the original survey, as well as the aforementioned recorded subdivision plan, and traverses across the property of ACEDC and/or Adams County.[8] The option parcel is accessed by a spur road which connects to the boulevard. In addition to bordering the option parcel, the boulevard, as constructed, borders other areas of the ACEDC property which are designated as separate proposed lots. At the junction of the spur road with the boulevard, the boulevard abruptly ends and does not connect with V-Twin Drive as designated on the subdivision plan. The record fails to conclusively reveal why ACEDC has not completed connection of the boulevard to V-Twin Drive; however, it appears to be related to the cost of the bridge required to traverse the wetlands that are located in between that portion of the boulevard, as constructed, and V-Twin Drive. Commissioner Weaver

8. The record is unclear as to whether ACEDC or Adams County is currently title holder to the strip of land upon which the boulevard lies. Although during argument it was suggested that this strip of land is currently owned by ACEDC, perusal of public record fails to disclose any deed transferring title to this strip of land from Adams County to ACEDC. Nevertheless, it is clear that the property is not owned by HH.

has suggested that it is impractical at this time to connect the boulevard to V-Twin Drive in that the cost is outweighed by the lack of necessity since V-Twin Drive currently accesses the remaining developmental lots in the commerce park. Deposition of Thomas Weaver, May 18, 2005, 49:3-49:7, 71:20-74:7.

It is this history which leads to the county's current argument that they are not responsible for the cost of road construction and improvements since, in effect, the boulevard, as constructed, provides access to the option parcel only. The county suggests that under these circumstances, the access is "direct" within the meaning of the addendum. Therefore, that portion of the addendum which provides "[HH] shall be solely liable for any and all costs and expenses in connection with, or arising from, such direct access . . ." is triggered. The county relies upon this interpretation as compelling the denial of HH's motion for summary judgment and the grant of summary judgment in their favor. I am not persuaded by this argument.

As noted above, when the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. *Steuart, supra.* The words of a contract are to be given their ordinary meaning and a court may not undertake a creative distortion of explicit and unambiguous terms under the guise of interpretation. *Little, supra.* The addendum at issue unequivocally sets forth the intention of the parties when it announces that "it is contemplated by the parties that the access to the option parcel shall be only by a spur or connection street from the main entrance drive (the 'boulevard')." Moreover, the addendum clearly intends "direct access" as something other than access across the

boulevard when it provides that if HH seeks direct access: "such direct access shall be prohibited in the event that any highway occupancy permit for any direct access from U.S. Route 30 to service the option parcel only prohibits, prejudices, hinders or renders more expensive the construction, or the design and/or permitting thereof, of the aforementioned boulevard as presently planned by seller and/or the Adams County Economic Development Corporation . . . ." Addendum to option agreement and agreement of sale, paragraph 2(d)(vi).

There is no doubt in this language that when the county agreed to be responsible for the improvements to U.S. Route 30 and/or U.S. Route 15, they were fully aware that the term "direct access" did not include access via the boulevard.

This interpretation is consistent with a common sense reading of the addendum giving the terms their ordinary meaning. According to Webster's New Collegiate Dictionary, "direct" is defined as "1 a: proceeding from one point to another in time or space without deviation or interruption: straight b: proceeding by the shortest way . . . marked by absence of an intervening agency, instrumentality, or influence." In this regard, the record is undisputable that the boulevard is not an immediate connection between U.S. Route 30 and the option parcel but rather permits the option parcel to access Route 30 by traversing across the property of ACEDC and/or Adams County.[9]

---

9. Both parties, in their briefs, extensively discuss the testimony of witnesses, as well as other documentation, in interpreting the intent of the parties. For instance, Catherine Cresswell, in her deposition, acknowledges that at the relevant time it was her understanding that direct access is straight access from U.S. 30 onto the lot itself. Cresswell deposition, p. 20. A December 18, 2003 memorandum from

The county ignores this common meaning of the word "direct" in suggesting that the boulevard is "direct access" because it currently is used solely by HH. The county's argument interprets "direct" access to mean "sole" access. This argument, however, ignores that HH does not have exclusive or sole control over use of the boulevard. HH could not limit the access of others to the boulevard even if they choose to do so. Rather, ACEDC and/or Adams County has the undeniable ability to manage use of the boulevard, subject, of course, to any right-of-way agreements which may place limitations on that right. The boulevard, as constructed, presently fronts other lots to the commerce park. ACEDC's decision to not currently utilize the boulevard does not detract from the fact that the boulevard is on the property of ACEDC and/or the county to be used as they so desire by whomever they desire. Undoubtedly, HH cannot preclude the boulevard from being developed as a primary access to

---

special counsel to the commissioners implicitly supports this understanding. On the other hand, representatives of the county testified that they construed the language to mean that "if [HH] was the entity that used the boulevard for access, then they would have to pay for it." See Weaver deposition, pp. 62-66. If I had found the terms of this contract to be unambiguous, these diversions in testimony would create a factual dispute precluding summary judgment. See *Fine v. Checcio,* 582 Pa. 253, 870 A.2d 850 (2005). However, since I find the terms of the addendum to be unambiguous, extraneous references to items outside of the agreement are immaterial. Where a written contract is unambiguous and held to express the embodiment of all negotiations and agreements prior to its execution, as the addendum does, neither oral testimony nor prior written agreements or other writings are admissible to explain or vary the terms of the contract. *Lenzi v. Hahnemann University,* 445 Pa. Super. 187, 195, 664 A.2d 1375, 1379 (1995). In such instances, the interpretation and construction of the contract is a matter of law to be decided by the court. *Roman Mosaic and Tile Co. v. Thomas P. Carney Inc.,* 729 A.2d 73, 77 (Pa. Super. 1999).

all the remaining lots of the commerce park. Thus, ACEDC's decision to not fully utilize the boulevard is quite different from the county's inaccurate claim that the boulevard services no other parcel and, therefore, is direct access. This argument by the county is unpersuasive and, therefore, is rejected.

The county seeks to avoid summary judgment on the additional basis that the county's obligation to construct and fund the construction of the boulevard has not yet been triggered pursuant to the terms of the addendum. They note that the addendum expressly incorporates the June 16, 2000 HOP. In doing so, the addendum bound HH to a term of the HOP which the county suggests made clear that the boulevard would only be constructed in the event that traffic on V-Twin Drive reached the average daily figure of 4,135 vehicles per day. The county concludes that since the average daily traffic flow has not reached 4,135 vehicles per day, the county's obligation to fund construction of the boulevard has not yet accrued.

The specific provisions of the HOP which are implicated by the county's contention are as follows:

"Whereas, the Department is willing to defer construction of required off-site highway improvements made necessary by the full build-out of the entire ACEDC project (Phase II improvements) conditioned upon ACEDC's agreement to apply for a supplemental HOP from the Department to accommodate full build-out traffic, prior to the Average Daily Traffic (ADT) for ACEDC Project reaching 4135 vehicles per day; and,

"Whereas, the Township, ACEDC, the County and the Department have agreed that the Township will not issue additional building permits for construction within the

proposed ACEDC project after the ADT from the ACEDC project reaches 4135 vehicles per day, until advised in writing by the Department that a supplemental HOP for full build-out (Phase II) of the proposed ACEDC project has been issued or is not required; ...."

A careful reading of this language refutes the county's suggestion. The relevant terms of the HOP are not a prohibition on the commencement of the Phase II improvements prior to traffic reaching 4,135 vehicles per day but, rather, a requirement that Phase II improvements be completed once traffic reaches 4,135 vehicles per day before additional building permits are issued for the commerce park. A full and fair reading of the HOP establishes that PennDOT granted the county and ACEDC a concession to phase the required roadway improvements so that development of the Pella Windows Inc. site could commence without a full build-out of the roadway infrastructure for the commerce park. Rather than setting a conditional threshold which must be satisfied before additional roadway improvements could be commenced, the HOP requires that the roadway infrastructure be completed before the commerce park is fully utilized. Contrary to the argument of the county, the HOP actually encourages prompt completion of the road improvements through the requirement that all parties to the agreement "cooperate with the Department for the issuance of the Phase II supplemental HOP for the construction of Phase II improvements." Highway occupancy permit construction and security agreement, June 16, 2000, paragraph 4.[10] This clear language presents

10. Interestingly, the county's position that all parties incorporated the terms of the HOP in the addendum agreement contradicts their

no restriction on commencement of the Phase II improvements. Since the terms of this document are unambiguous, I find, as a matter of law, that they do not control or affect the timing of the county's obligation to fund the road improvements. The county's distorted interpretation of this language is rejected.

Although I have found that the HOP is immaterial in regard to the timing of the county's obligation to fund the Phase II improvements, it is equally clear that the various documents executed between the parties are not specific in setting a date when the county's obligation accrues. Although the original option agreement between the parties notes that "time is of the essence" (Option agreement, February 14, 1996, paragraph 19), it does not specify a particular date for necessary roadway improvements other than to indicate that the "county agrees to fully cooperate with and assist and support [HH] in obtaining all governmental permits and approvals in sewer and water and other utility services and capacity as [HH] may reasonably determine are necessary or appropriate for [HH's] intended development of the option parcel."

---

previous argument concerning whether the boulevard constitutes "direct access" to the option parcel. Paragraph 5 of the HOP provides, in relevant part, "The parties agree that no lot within the proposed ACEDC project shall have direct access to S.R. 30." Their current argument that the addendum bound HH to the terms of the HOP leads to the unavoidable conclusion that all parties agreed that "direct access" to the option parcel would not occur. To conclude otherwise would require a finding that the HOP did not apply to the option parcel or, on the other hand, that the county intentionally participated in a breach of the HOP when they negotiated the addendum to the option agreement with HH. I will not presume that county officials intended to breach any legal obligation but, rather, interpret the net effect of the documents as reinforcing the conclusion that the boulevard is not "direct access" as contemplated by the parties.

*Id.* at paragraph 11. Similarly, the addendum, although incorporating the time of the essence clause of the original option agreement, is silent in regard to a specific date in which Phase II improvements would commence. The documents incorporated in the addendum are consistent in that they do not speak to a specific date for construction of Phase II improvements. Nevertheless, the lack of an express completion date for the Phase II improvements, and thus the county's obligation to fund those improvements, is not fatal to my analysis. Where a contract is non-specific as to the time of performance, Pennsylvania law imputes an understanding that performance will be completed within a reasonable time. See Farnsworth, Contracts (3d ed. 1982), §3.28, p. 197 (courts have . . . had little difficulty in supplying and enforcing terms under which a specified duty . . . is to be performed within a "reasonable" time if no other time is stated); Restatement (Second) of Contracts, §204 (when the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court); *Lefkowitz v. Hummel Furniture Co.,* 385 Pa. 244, 247, 122 A.2d 802, 804 (1956) ("[W]here no time for performance is provided in the written instrument the law implies that it shall be done within a reasonable time...").

Instantly, the parties entered a variety of agreements which contemplated development of the option parcel. At the time they reached agreement, the parties intended that access to the option parcel would be obtained through a spur road connecting with the boulevard. Undoubtedly, all parties were anxious for development to occur

promptly. However, absent road access, development on the option parcel is impossible. Thus, it is reasonable to conclude that the Phase II improvements were contemplated to commence with HH's development of the option parcel.

Although the court may supply a term providing for a performance of contractual obligations within a reasonable time, it is not necessary for me to do so under the current circumstances. Pursuant to their contractual obligations, ACEDC joined with HH in obtaining the second highway occupancy permit required for the Phase II improvements. HH did not, nor could, unilaterally commence construction of the Phase II improvements as they were not legal owners of the property upon which the improvements were being conducted. ACEDC's own actions refute the county's argument that a traffic volume of 4,135 on V-Twin Drive was a condition precedent to Phase II improvements. By transferring management of the commerce park development to ACEDC, the county ceded any ability that it had to control the timing of those improvements. Nevertheless, the county's contractual obligation to fund those improvements remained unimpeded. Once ACEDC chose to commence those improvements in furtherance of the general goal of developing the commerce park, the county's obligation to fund the Phase II improvements was triggered. In reaching this conclusion, I am reminded that at all times relevant to this litigation, the Adams County Commissioners were voting board members of ACEDC. It is nonsensical to conclude that, although an entity with which the county is intimately involved applied for permission to construct the boulevard, the county is relieved from fulfilling their contractual obligations based upon a theory that construc-

tion of the boulevard was premature. Accordingly, I find the county's argument meritless.

Although discussion thus far has been limited to HH's claim for reimbursement for highway improvements generally, an additional issue arises in addressing the claim for one-half of the costs of the boulevard which is not relevant to discussion concerning the U.S. Route 30/U.S. Route 15 improvements. Specifically, the county contests their responsibility for half of the costs of improvements of the boulevard on the basis that the contractual documents are silent as to their liability in this regard. Indeed, my reading of the contractual documents supports their factual claims that the contracts are silent on this matter. However, I do not reach the conclusion that the county suggests.

Unquestionably, the contracts at issue do not expressly state that the county shall pay one-half of the costs of the boulevard. That fact, however, does not end our inquiry. Pennsylvania contract law recognizes the doctrine of necessary implication in interpreting duties pursuant to a contract. The Superior Court, in *Daniel B. Van Campen Corporation v. Building and Construction Trades Council of Philadelphia,* 202 Pa. Super. 118, 195 A.2d 134 (1963), described the principle as follows:

"The law is clear that in the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract. Accordingly, a promise to do an act necessary to carry out the contract must be implied." *Id.* at 122, 195 A.2d

at 136-37. See also, *John B. Conomos Inc. v. Sun Company Inc.,* 831 A.2d 696 (Pa. Super. 2003). Where it is clear that an obligation is within the contemplation of the parties at the time of contracting or is necessary to carry out their intentions, the court may imply it. *Slater v. Pearle Vision Center Inc.,* 376 Pa. Super. 580, 586, 546 A.2d 676, 679 (1988). Since the doctrine of necessary implication serves to allow the court to enforce the clear intentions of the parties and avoid injustice, the court does not need to find an ambiguity before it will employ the doctrine. *Id.* While the doctrine permits the court to imply a term necessary to carry out the purpose for which the contract was made, it must be apparent that the obligation is within the contemplation of the parties at the time of contracting and abundantly clear that the parties intended to be bound by such term.

Although the record is sparse in this regard, a diligent search of the record has failed to uncover any factual dispute concerning the understanding of the parties. In fact, the only real discussion of the issue is found in the deposition testimony of the county's special counsel. In discussing the timing of the county's obligation under the addendum agreement, special counsel indicated: "if and when the duty to construct the boulevard arises from whatever set of circumstances or edict by whomever, I think that the option agreement and the addendum provisions regarding the access road are pretty clear, and at that point the county will have financial obligations regarding part of the cost of the boulevard and part of the cost of Route 30 . . . and the Route 15 improvements." Deposition of John White, Esquire, May 20, 2005, 88:7-88:14.

At a later deposition, general counsel reiterated that belief:

"Question: Do you recall you providing me the opinion that—and I'll let you read it. It's line 5 through line 14—that it was your opinion in December of 2003—the same time you wrote the memo, correct?

"Answer: Um-hum.

"Question:—that if and when the boulevard construction arises from whatever circumstances or edict or by whomever, that you thought the county had a pretty clear obligation to fund—and I'm paraphrasing—the boulevard and you said part of the cost to Route 30. I assume you meant part of the boulevard and the Route 30 improvements.

"Answer: Um-hum.

"Question: Is that an accurate statement?

"Answer: Yes.

"Question: Do you still believe that to this day?

"Answer: Yes, I do." Deposition of John White, September 13, 2006, 18:1-18:16.

Additional support for the understanding that the county would assume the remaining half of the costs of the boulevard is found in deposition testimony of Commissioner Weaver. In discussing paragraph 2(d)(vi) of the addendum, the following exchange occurred:

"[Attorney Piermattei] What was your understanding with the intent of that paragraph?

"[Commissioner Weaver] Well, let me read the whole paragraph.

"[Attorney Piermattei] Okay.

"[Commissioner Weaver] Yeah, the intent there was to basically carry forward from the original option agree-

ment the possibility of; again, sharing in the cost of that boulevard should the boulevard be used as access to both North Ridge parcels and the county/Economic Development Parcels . . . ." Deposition of Thomas Weaver, May 18, 2005, 60:17-61:1.

Interestingly, although the comments of special counsel and Commissioner Weaver challenge whether the county has any obligation on theories related to "direct access" and timing, neither question nor dispute the extent of the county's obligation to fund half of the costs of the boulevard in the event an obligation is found to exist. In fact, a painstaking review of the record in this matter fails to reveal any factual question as to the extent of the county's obligation in this regard. Moreover, other than general denials in the pleadings, the county has failed to direct the attention of this court to any part of the record which would present a factual dispute concerning the understanding of general counsel and Commissioner Weaver.[11]

The record, rather than establish a factual dispute on this issue, actually corroborates the conclusion that inclusion of the missing term is necessary to carry out the intent of the parties and to prevent injustice. Setting aside any issues as to the timing of the obligation or the meaning of "direct access," it is apparent within the four corners of the addendum that the parties contemplated that access to the option parcel would be by a connection

---

11. When a motion for summary judgment is made and supported by the factual record, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavit or as otherwise provided in the Rules of Civil Procedure, must set forth the specific facts showing that there is a genuine issue for trial. *Phaff v. Gerner*, 451 Pa. 146, 151, 303 A.2d 826, 829 (1973).

street from the boulevard. It is equally clear that the entire transaction was based upon the mutual desire of the parties to develop the option parcel. As previously mentioned, logic, as well as the rules of science and nature, dictates that access to a parcel is necessary for its development and use. Where two parties contract for the transfer of a property with the express understanding that access to the transferred property will be across seller's property upon purchaser paying half of the cost of that access, and where no other parties are involved in the transaction, it is clear that the parties contemplated the seller to pay the remaining costs. To hold otherwise would be to frustrate the clear intent of the parties.

Based on the foregoing, I find that entry of summary judgment is appropriate in favor of HH and against the county on the breach of contract claim to the extent that Adams County is responsible to reimburse HH for the full costs of the State Route 30/State Route 15 improvements as well as half of the costs for construction of the boulevard and other costs and fees permitted pursuant to the agreements between the parties. Additionally, the county will be directed to specifically perform the remaining obligations under the option agreement and addendum to the option agreement to the extent the same will not be reimbursed through monetary damages. Having found in favor of HH in regard to the breach of contract action, the promissory estoppel adds nothing to the dispute between the parties and, therefore, is stricken. The remaining count in HH's complaint is a count of fraud against the individual commissioners.[12]

---

12. The complaint lists Commissioners Harry Stokes, Thomas Weaver, and Thomas Collins as defendants. Commissioners Stokes

To demonstrate fraud, the plaintiff must establish the following elements: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by reliance." *Martin v. Hale Products Inc.,* 699 A.2d 1283, 1288 (Pa. Super. 1997). Our courts have recognized, however, that the breach of a promise to do something in the future is not actionable in fraud. *Shoemaker v. Commonwealth Bank,* 700 A.2d 1003, 1006 (Pa. Super. 1997). Thus, non-performance of an agreement is not, in and of itself, evidence of fraud. *Permenter v. Crown Cork and Seal Co. Inc.,* 38 F. Supp.2d 372, 382 (E.D. Pa. 1999); *affirmed,* 210 F. 3d 358 (3d Cir. 2000).

Ironically, it is the county's arguments in defense of the breach of contract claim which spawns the cause of action for fraud. In defending the breach of contract action, the county has claimed that their obligation to fund the improvements has not yet accrued since the traffic volume on V-Twin Drive has not reached the number listed in the HOP. The county further argues that they are not responsible for the highway improvement costs since the boulevard's intended role as a main access has been usurped by the development of V-Twin Drive. HH suggests that if the factual record and/or contract interpretation support either of these theories, then county officials acted with bad faith in the formation of the contractual relationship between the parties.

------

and Collins are no longer members of the current board, having been replaced by the current Commissioners Glenn Snyder and Lucy Lott. Neither Commissioner Snyder or Lott, in their individual capacity, is a party to this action.

The county's suggestion that their responsibility to fund Phase II improvements does not accrue until the attainment of a particular traffic volume on V-Twin Drive facially bolsters HH's cause of action for fraudulent misrepresentation. For example, there are clear indications in the record that county officials were aware that the traffic volume for the commerce park referred to in the HOP would never be met. In referring to the thought process of ACEDC, of which the three county commissioners were directors, Catherine Cresswell related that the ACEDC board felt fairly comfortable that the 4,135 traffic volume number was not going to be exceeded because of the large tract of land being taken by Pella. She explained, "If we would have put 10 businesses back there, it would have been more likely that that would be a number we would exceed. But because we were placing one business on so much of the acreage, we felt that our estimates were actually shown what we might max out at 3,000 to 3,200." Deposition of Catherine Cresswell, December 15, 2005, 43:21-44:2. If this is true, the county's current argument, followed through to its logical conclusion, suggests the county entered an agreement with HH for the development of property which required HH to access the proposed development over a route which the county knew would never be constructed because of a lack of traffic volume necessary to trigger the road development. Such an interpretation would make the option parcel valueless, thereby raising serious questions as to the county's good faith. I do not impute such a deceptive intent on the part of county officials but, rather, interpret their current argument as a creative, yet unpersuasive, means to limit county liability.

HH depicts the county's second defense in similar fashion. They observe that if it is found to be factually correct that the county intended V-Twin Drive, rather than the boulevard, to be the main access, then the county acted in bad faith in intentionally misrepresenting critical information to HH concerning development of the commerce park. HH cites to a factual record which indicates that V-Twin Drive was actually developed prior to execution of the addendum to the option agreement. Thus, they allege, if the county's current argument that the addendum agreement was somehow contingent upon the boulevard being used as a main access, then the county committed fraud in the addendum to the option agreement by materially misrepresenting use of the boulevard as the main access when, in fact, the county had no such intent.

It is indeed curious, in light of the county's argument, that the county signed off on subdivision plans in September 2000 which included the boulevard as a primary access to the commerce park at a time subsequent to the completion of V-Twin Drive. Curiosity is further peaked by the actions of ACEDC on that same date in entering into an agreement with HH which references the boulevard as being "a main entrance." Confirmation of the county's continued representations that the boulevard was contemplated to be the main entrance is found in the April 2001 addendum which was executed by the county commissioners. Since very little at the commerce park has changed since the county and ACEDC made these contractual representations to HH, one might argue from the record that the county induced HH to enter into an agreement based upon representations that the boulevard was a main access when the county commissioners knew that state-

ment to be false. Nevertheless, I find that granting HH's request for summary judgment is inappropriate.

In ruling upon this issue, I am mindful that summary judgment may only be granted where there are no disputed issues of fact. It is obvious from the record that HH's claim for fraud is replete with factual issues, thereby precluding summary judgment. More importantly, in light of the resolution of the contractual issues as discussed above, it is impossible for me to find a material misrepresentation when I have found that the county is legally bound by the contractual language executed between the parties. In essence, by finding the representations in the agreements to be enforceable, I have rejected the interpretations enunciated by the county. Since HH's claim of fraud is based upon an interpretation which I have rejected as a matter of law, the element of a fraudulent misrepresentation is lacking. Moreover, since HH's contractual rights have been found to be valid and enforceable, I am unable to find any injury or damages sufficient to support judgment in favor of HH based upon a theory of fraud. Accordingly, HH's motion for summary judgment on the fraud count is denied.

The defendants have filed numerous motions for summary judgment which essentially mirror HH's motions; however, they suggest that the record supports summary judgment in their favor. As each of these issues has been thoroughly discussed above, the county's motions for summary judgment are denied with the exception that the motion for summary judgment in regard to Count IV, fraudulent misrepresentation against defendants Weaver, Stokes, and Collins, is granted.

In sum, stripped of all its technical legalese, the issue and factual background before the court is quite basic.

HH and Adams County entered agreements for HH's purchase of the option parcel from the county with the express understanding that the county would pay for the road infrastructure necessary to access and develop the option parcel. The option parcel is currently in full development to the undisputed benefit of the county's tax base. Significant improvements at the Route 30/Route 15 interchange have been completed to the benefit of commerce park properties and the citizens of Adams County. It is unquestionably the county's obligation to fund these improvements.

For the foregoing reasons, the attached order is entered.

## ORDER

And now, January 11, 2007, it is hereby ordered that plaintiffs' motion for summary judgment is granted in regard to Counts I and II of the amended complaint and denied in regard to Counts III and IV of the amended complaint. Defendants' motion for summary judgment is denied in regard to Counts I, II and III of plaintiffs' amended complaint and granted in regard to Count IV of plaintiffs' amended complaint. Count III is stricken as moot. Summary judgment on Count I and Count II of the amended complaint is granted in favor of plaintiffs in regard to liability only. A pretrial conference for trial on the issue of damages is scheduled for February 5, 2007 at 10 a.m. in Room 411 of the Adams County Courthouse at which time counsel are directed to appear. It is ordered that the parties be available either in person, or by telephone, at the time of the conference. Failure of any party to be available may result in the imposition of sanctions including legal fees.